UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **FILED** |
| v. | : Cr. No. 07-137 | JUL 1 2 2007 |
| | : Violation: | NANCY MAYER WHITTINGTON, CLERK U.S. DISTRICT COURT |
| BAHRAM SHAHRIARI | : 18 U.S.C. §§ 371, 2 (Conspiracy, aiding and abetting, causing an act to be done) | |
| Defendant. | : | |

## STATEMENT OF OFFENSE

The United States and Bahram Shahriari agree that the following facts are true and correct:

I am the owner and sole employee of the Applied Power Group ("APG"), which I operate out of an office in my home in Virginia. APG is in the business of selling and installing mechanical equipment to businesses throughout the greater Washington, D.C., area.

One of APG's customers was PM Services, a federal contractor that managed government buildings in Washington, D.C. C.W. worked for PM Services as an engineer at the federal Cohen and Switzer buildings, which were located within the District of Columbia. In or about 2001, I began bidding for subcontracting work at the Cohen and Switzer buildings. I submitted the bids to C.W. on behalf of APG. After I submitted my first bid, C.W. told me that my bid was too low and that there was more money in the contract that he could pay me. C.W. also told me that I needed to pay him a percentage of the contract price in cash if I wanted to be awarded this particular contract and any future contracts.

Initially, I was reluctant to pay the requested kickbacks. I told C.W. that I would pay him if he did some work himself. I also told C.W. that I would not pay him any money in cash but only by check. In early 2001, I paid C.W. extra money to start up a particular mechanical device on a job at the Cohen and Switzer building that was not paid for by PM Services. The equipment was purchased from APG by a company referred to herein as Contractor-1. I did not perform any further work for C.W. at the Cohen and Switzer buildings until mid 2001. At that point, I began paying C.W. the requested kickbacks by check. Although I continued to tell myself that C.W. was performing additional work under the subcontracts that I was awarded, I was unaware of any work that he could perform under the subcontracts and I did nothing to verify that either he or the company that he owned, T-N-T Heating and Air Conditioning, was performing work. From June, 2001, through July, 2003, the check payments that I made to T-N-T in connection with various subcontracts that I was awarded were nothing more than kickbacks to C.W. to get jobs.

The scheme, as a general matter, worked in the following way: I would submit a quotation to C.W. that included the cost to me, plus profit, for completing the work. In response to my quotation, C.W. would sometimes call me to tell me that there was more room in the contract, (i.e., between my quotation and the maximum amount that GSA would approve for the work), and C.W. would tell me to add a certain amount to my quotation. Other times, C.W. would simply change my bid himself in order to add an additional amount that took account of the higher amount that GSA would approve for the work. In either event, I was awarded contracts at the inflated price. Because the contract price for the work that I performed was inflated and I paid C.W. only a percentage of the inflated price, I also kept a portion of the inflated difference for myself and, thus, profited from the kickback scheme. I paid C.W. the

requested kickbacks by checks drawn on APG's SunTrust bank account. C.W. told me that he was sharing the kickbacks that I paid him with another individual called W.O'S, but I paid him with a single check.

Over time, C.W. began drafting proposals for APG to submit to PM Services in connection with jobs at the Cohen and Switzer buildings. On behalf of APG, C.W. would describe the scope of work for various mechanical jobs and price the cost of the work. Some of these proposals were done without my knowledge. C.W. then would notify me of jobs that APG would be awarded and the amount that I needed to pay him in order to receive this work. Occasionally, C.W. would e-mail worksheets to me that calculated the cost of performing each job, including the share that I was to pay to him and the amount of the overpayment that I could keep. In order to receive the work, I paid the requested kickbacks.

Although I usually performed the work specified in the purchase orders that I received, I recall at least one occasion when C.W. asked me to create fictitious contracting documents. On or about February, 2002, C.W. asked me to fax an invoice to Contractor-1 for consulting services that APG had supposedly provided to Contractor-1. At the time, APG had never provided consulting services to Contractor-1 so that there was no reason for APG to send such an invoice. Nevertheless, I submitted a phony bill for $20,000 for consulting services to Contractor-1. Contractor-1, in turn sent me a check for $20,000. After I received this check, I sent C.W. a check for $16,000, payable to C.W.'s company, T-N-T Heating and Air Conditioning. I kept the $4,000 difference between the payment that I received from Contractor-1 and payment that I made to C.W.

On or about June 12, 2002, C.W. drafted a job quotation on behalf of APG wherein APG purported to offer to provide labor and materials to insulate various pipes and equipment at the

3

Cohen and Switzer buildings. The quotation purported to complete this project for a total price of $11,368.00. This quotation had been falsely inflated, as C.W. and SHAHRIARI then well knew.

On or about June 18, 2002, C.W. caused PM Services to issue purchase order number 1429 to APG. In the purchase order, PM Services agreed to pay APG $11,368.00 to insulate the pipes and equipment referenced in the June 12, 2002, quotation. This purchase order had been falsely inflated as as C.W. and SHAHRIARI then well knew. C.W. thereafter caused a copy or copies of the purchase order to be sent via Federal Express from PM Services office in Washington, D.C. to PM Services headquarters in Florida.

Between on or about June 18, 2002, and on or about August 26, 2002, APG caused the work specified in purchase order number 1429 to be performed.

On or about August 26, 2002, PM Services paid APG $11,368.00 based on purchase order number 1429. This payment was made by check, and was delivered to APG via the United States Postal Service.

On or about September 3, 2002, I wrote check number 0451 on APG's SunTrust Bank Account payable to T-N-T in the amount of $5332.50 and provided said check to C.W. as a kickback payment. I kept for myself $1777.50 of the inflated payment that I had received from PM Services for completing purchase order number 1429.

I declare under penalty of perjury that the foregoing is true and correct.

                              Respectfully submitted,

                              JEFFREY A. TAYLOR
                              United States Attorney
                              for the District of Columbia

By:    _____
                              JOHN GRIFFITH
                              Assistant U.S. Attorney
                              555 4th Street, N.W.
                              Washington, D.C. 20530
                              (202) 353-2453


## DEFENDANT'S ACCEPTANCE

I have read every word of this Statement of Offense. Pursuant to Fed. R. Crim. P. 11 and 28 U.S.C. § 1746, after consulting with my attorney Robert Trout, Esq., I agree and stipulate to this Statement of Offense, and admit and declare under penalties of perjury that the facts recited within this Statement of Offense are true and correct.

Date: __7/12/07__                 _____
                                              Bahram Shahriari, Defendant

5

I have discussed this Statement of Offense with my client, Mr. Shahriari. I concur with his decision to stipulate to this Statement of Offense.

Date: 7/12/07

Robert Trout, Esq.
Attorney for the Defendant